UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| KENDALL G. SOHASKI, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )    CAUSE NO. 1:12-CV-00276 |
| | ) |
| CAROLYN W. COLVIN,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
|     Defendant. | ) |

## OPINION AND ORDER

Plaintiff Kendall Sohaski appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[2] (Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED for further proceedings in accordance with this Opinion.

### I.  PROCEDURAL HISTORY

In the spring of 2009, Sohaski filed an application for DIB, alleging disability since October 3, 2008. (Tr. 20, 144-45.) His claim was denied initially and upon reconsideration, and Sohaski requested an administrative hearing. (Tr. 81-92.) Administrative Law Judge ("ALJ") John Pope conducted a video hearing on January 6, 2011, at which Sohaski, who was represented by counsel, and a vocational expert testified. (Tr. 37-76.)

---

[1] Although Plaintiff brought this suit against Michael J. Astrue, the former Commissioner of Social Security, Carolyn W. Colvin is now the Acting Commissioner. As such, under Federal Rule of Civil Procedure 25(d), Colvin is automatically substituted as a party in place of Astrue. FED. R. CIV. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (Docket # 14); *see* 28 U.S.C. § 636(c).

On July 11, 2011, the ALJ rendered an unfavorable decision to Sohaski, concluding that he was not disabled because he could perform a significant number of jobs in the economy. (Tr. 20-32.)  The Appeals Council denied his request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-16, 256-58.)

Sohaski filed a complaint with this Court on August 14, 2012, seeking relief from the Commissioner's final decision. (Docket # 1.)  In his appeal, Sohaski argues that the ALJ improperly denied him benefits for his alleged failure to follow medical treatment and improperly evaluated his residual functional capacity ("RFC"). (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 15-19.)

## II.  FACTUAL BACKGROUND[3]

### A.  Background

At the time of the ALJ's decision, Sohaski was fifty years old (Tr. 32, 144); had a bachelor's degree in psychology (Tr. 43); and had previously worked as a sales associate, assistant manager, and stock broker (Tr. 45, 74, 177).  Sohaski alleges that he became disabled as of October 3, 2008, due to bipolar disorder, generalized anxiety disorder, and personality disorder, not otherwise specified ("NOS"), with narcissistic, dependent, and borderline features. (Opening Br. 2.)

### B.  Sohaski's Testimony at the Hearing

At the hearing, Sohaski testified that he lives alone in an apartment. (Tr. 42.)  He last worked in October 2008 as a full-time sales associate for H.H. Gregg and was still receiving private disability benefits through his employer. (Tr. 44-45.)  He represented that he has been

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 677-page administrative record necessary to the decision.

2

diagnosed with bipolar disorder, suicidal ideation, drug and substance abuse in remission, alcoholism, anxiety, depression, sleeplessness (possibly insomnia), and memory loss. (Tr. 52-53.) According to Sohaski, these conditions cause him to lose focus and make it difficult for him to deal with authority; the fatigue from his insomnia makes it difficult for him to concentrate; and he also experiences memory loss and anxiety when dealing with others. (Tr. 53-54.) Sohaski also described a history of purposely burning himself. (Tr. 65-66.) Regarding his treatment, Sohaski received dialectical behavioral therapy at Park Center and individual counseling once a week from February 2010 until May 2010, when he ran out of money; he also saw a certified nurse for medication once a month. (Tr. 54-56.)

Sohaski's typical day involves reading, performing light household chores, playing with his cat, listening to the radio, watching television, and walking up to four miles with one of his golf buddies, whom he sees twice a week. (Tr. 48-49, 51, 56.) He is independent with his self care and goes to the grocery store twice a month with his mother; he does not like to shop alone because of anxiety. (Tr. 51.) His mother reminds him to do household tasks such as feeding the cat and cleaning the house. (Tr. 68-69.) Besides reading, Sohaski enjoys golfing. (Tr. 51-52.)

*C. Summary of the Relevant Medical Testimony*

In late 2006, Sohaski saw Revathi Bingi, Ed., for mental health counseling. (Tr. 317.) In January 2007, however, Dr. Bingi expressed concern that Sohaski failed to seek counseling on a regular basis. (Tr. 317.)

In July 2007, Sohaski went to the emergency room after overdosing on Soma; he was transferred to Parkview Behavioral Health. (Tr. 293-94.) He was assigned a current Global Assessment of Functioning ("GAF") score of 35-50 and diagnosed with polysubstance

dependence; depressive disorder, NOS; and rule-out substance induced mood disorder.[4] (Tr. 294.) By the end of September, Sohaski had dropped out of treatment with Park Center without providing a reason. (Tr. 296.) The discharge summary noted active, but inconsistent, participation in treatment and a GAF of 47. (Tr. 296.)

Almost a year later, in July 2008, the police brought Sohaski to the emergency room after he threatened to shoot himself; he had been drinking heavily. (Tr. 276.) He was admitted and placed on a 24-hour hold. (Tr. 274.) On psychiatric evaluation, Dr. Gladys Beale observed that Sohaski was medication-seeking, manipulative, and not entirely honest. (Tr. 280-81.) Sohaski represented that he was working at H.H. Gregg and did not feel like his job was in jeopardy; he purportedly had been functioning fairly well there despite his binge drinking. (Tr. 281.) Dr. Beale diagnosed Sohaski with alcohol and nicotine dependence, narcotic prescription medication and benzodiazepine abuse, major depression, and rule-out substance induced mood disorder; she assigned him an admission GAF of 30. (Tr. 282.) A discharge summary dated August 2008—but seemingly referencing this July 2008 admission—included diagnoses of severe alcohol dependence, benzodiazepine abuse, nicotine dependence, major depression, and

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends). *Id*. A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). *Id*. A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id*. A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id*. And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id*.

borderline personality disorder traits and gave Sohaski a discharge GAF of 50. (Tr. 284.)

After his discharge, Sohaski was seen at Psychiatric Care, Inc., for an initial assessment. (Tr. 530-34.) He reported dealing with alcoholism and depression for years, but also that he had periods of sobriety ranging from a few months to a few years. (Tr. 530.) He indicated that in the past he had twice stopped medication for his depression due to the decreased libido it caused, and that he would discontinue his medication if his memory problems continued or his libido decreased. (Tr. 530-31, 534.) Sohaski was assigned diagnoses of major depression and alcohol dependence. (Tr. 534.)

Sohaski returned to Psychiatric Care three times in August 2008; he was on medication, and his mood was improved. (Tr. 521-23.) At the end of September, Sohaski saw Elizabeth McGee, a nurse practitioner, at Psychiatric Care. (Tr. 529.) Sohaski felt that his depression was worse in some ways because he was not using alcohol as a shield. (Tr. 529.)

In the beginning of October, Sohaski was hospitalized because he was suicidal; he had sent his girlfriend a text message indicating that he wanted to kill himself. (Tr. 300, 406.) Sohaski was diagnosed with depressive disorder, NOS; and borderline personality disorder; and assigned a GAF of 30. (Tr. 357.) Four days later, Sohaski was discharged with diagnoses of generalized anxiety disorder; dysthymia; alcohol dependence; and personality disorder, NOS (narcissistic, dependent, and borderline). (Tr. 403.) The discharge summary noted his discharge GAF as 65, his condition as stable and improved, and his prognosis as fair. (Tr. 403.)

About two weeks later, Sohaski was hospitalized again, reporting that he had been unsuccessful in a suicide attempt in which he had taken over 65 assorted pills. (Tr. 326, 337-38, 389, 452.) He was assigned a GAF of 15. (Tr. 337-38, 389.) Four days later, Sohaski was

discharged with diagnoses of major depression, recurrent and severe without psychotic features; alcohol dependence in partial remission; and personality disorder, NOS; and a discharge GAF of 45. (Tr. 389.) He was instructed to participate in an intensive outpatient program ("IOP"), attend twelve-step meetings regularly, and work with his sponsor. (Tr. 397.)

At the end of October, Sohaski saw Ms. McGee again, reporting suicidal ideation since leaving the hospital and that his depression was more global. (Tr. 528.) Ms. McGee found that Sohaski continued to be untruthful in his use of prescriptions—he had a history of enlisting multiple prescribers to obtain his medication of choice—that he had poor insight into and desire to attend to his illness, and that he was resisting his treatment plan. (Tr. 528.)

The following month, November 2008, Sohaski reported "feeling bad" and like he was drowning; he had thoughts of stepping in front of a bus. (Tr. 527.) Ms. McGee found him depressed with suicidal ideation and noted that it was still difficult for him to be honest. (Tr. 527.) By December, Sohaski had completed a psychiatric IOP (Tr. 519), but was not tracking well; he and Julie O'Leary, his counselor, discussed his possible need for a higher level of care (Tr. 520). At the end of the month, Sohaski's depression was unchanged, and he admitted suicidal ideation, but agreed to an IOP. (Tr. 526.)

In February of the following year, Sohaski returned to Ms. McGee, complaining that he was "still miserable," but working on a recovery plan. (Tr. 525.) Ms. McGee noted that he was six months sober and that, although he continued to have suicidal ideation, he had no plans. (Tr. 525.) The next month, Sohaski's daily suicidal thoughts persisted though he had no plan or intent of committing suicide; Ms. McGee again observed that he struggled with honesty. (Tr. 524.)

In August 2009, Wayne Von Bargen, Ph.D., performed a mental status examination of Sohaski at the request of the state agency. (Tr. 535-37.) Sohaski reported experiencing suicidal ideation every day and that he was not currently taking any medication due to a lack of health insurance and financial problems; he had discontinued his medication in March. (Tr. 535.) Dr. Von Bargen observed that Sohaski presented "a mixed symptom picture of impulsivity, polysubstance abuse, agitation, restlessness, and irritability," and that although the diagnostic picture was unclear, the presence of a bipolar disorder and borderline personality disorder, with some symptom overlap, appeared possible. (Tr. 536.) He found that Sohaski's history of polysubstance abuse complicated the diagnosis, but noted that Sohaski appeared able to adequately care for himself and perform routine daily activities. (Tr. 536.) Ultimately, Dr. Von Bargen assigned Sohaski a GAF of 50 and diagnosed him with bipolar disorder, NOS; polysubstance dependence in partial remission; and borderline personality disorder. (Tr. 536-37.)

The next month, Dr. Stacia Hill, a state agency psychologist, completed a "Psychiatric Review Technique" and "Mental Residual Functional Capacity Assessment." (Tr. 539-56.) She found that Sohaski had mild restrictions in activities of daily living and in maintaining social functioning; moderate restrictions in maintaining concentration, persistence, or pace; and experienced one or two episodes of decompensation. (Tr. 549.) When assessing Sohaski's mental RFC, Dr. Hill concluded that Sohaski was moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and interact appropriately with the general public; but not significantly limited in the remaining sixteen areas of work-related mental activities. (Tr. 553-54.) In the end, Dr. Hill determined that Sohaski's allegations were only partially credible given that his activities of

7

daily living appeared within normal limits and his attention and concentration, though moderately impacted, appeared reasonable for simple tasks. (Tr. 555.)  Dr. Hill opined that, while Sohaski would not be expected to complete complex tasks, he could complete repetitive tasks on a sustained basis without special considerations. (Tr. 555.)

Sohaski saw Ms. McGee again in December 2009, reporting that he was exercising daily by walking four miles a day and weight training for a spring golf league. (Tr. 565.)  He told her that he could no longer work, stating that he would "be in [his] grave if [he] had to work." (Tr. 565.)

In January 2010, Sohaski was referred to Robert Walsh, Psy.D., for another mental status exam. (Tr. 558-60.)  Sohaski reported that he was scheduled to see an intake counselor at Park Center to transfer his care there due to financial limitations and an inability to afford treatment at Psychiatric Care. (Tr. 558.)  He complained of difficulty sleeping; daily suicidal ideation, but no current plans; and panic and increased stress when leaving his house. (Tr. 558.)  Dr. Walsh diagnosed him with bipolar disorder; anxiety disorder, NOS; and polysubstance abuse, in reported remission. (Tr. 560.)  In addition, Dr. Walsh assigned Sohaski a GAF of 50, observed that he reported significant symptoms of mood instability and anxiety, and concluded that he would benefit from medication management and outpatient therapy. (Tr. 560.)

The following month, Sohaski was seen at Park Center for an initial assessment, presenting with a history of polysubstance dependency, suicidal ideation, work avoidance, and intermittent suicidal thoughts. (Tr. 566.)  He reiterated that he never wanted to work again; the evaluator noted that Sohaski might have difficulty succeeding in treatment because of his expressed desire for secondary gains. (Tr. 566.)  Sohaski was diagnosed with other substance

induced mood disorder; polysubstance dependence; and personality disorder, NOS, with borderline features; the evaluator assigned him a GAF of 41. (Tr. 572.) Sohaski was referred to Karen Lothamer, CNS, for a psychiatric evaluation and to a dialectical behavioral therapy ("DBT") program. (Tr. 566.) A few days later, Sohaski was seen for individual counseling. (Tr. 588-91.) The only abnormal findings from the mental status exam were a depressed and anxious mood and restless behavior. (Tr. 589.) At the end of the month, Sohaski participated in group therapy as part of his DBT program. (Tr. 592-95.) On mental status exam, his mood was expansive, his behavior was restless, and his thought content was grandiose. (Tr. 593.)

In April, Sohaski saw Ms. Lothamer for a diagnostic evaluation, reporting problems with sleep, night terrors, anxiety, mood swings, suicidal ideation, and depression. (Tr. 579.) He was purportedly referred to Park Center because he could no longer afford a private provider. (Tr. 579.) Ms. Lothamer noted an intense mood, flat affect, disorganized thoughts, some memory lapses, a focus on depression, daily suicidal thoughts without a plan, anxiety, and past drug abuse. (Tr. 580.) Sohaski's diagnoses and GAF remained unchanged in Ms. Lothamer's evaluation and in a treatment plan completed in May. (Tr. 580-81, 596.)

Sohaski cancelled a medication review with Ms. Lothamer in May (Tr. 583, 666, 669), and a June note indicated that he had not been seen in the DBT department since May and did not have an upcoming medication review scheduled (Tr. 666). A Park Center treatment plan completed in August contained the same diagnoses and GAF as the May treatment plan and reflected that Sohaski had failed to respond to attempts to contact him by phone and mail and was no longer requesting Park Center services. (Tr. 669.)

9

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

### IV. ANALYSIS

#### A. *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, with respect to steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On July 11, 2011, the ALJ rendered his decision. (Tr. 20-32.) He found at step one of the five-step analysis that Sohaski had not engaged in substantial gainful activity since the alleged

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

onset date, and, at step two, that he had the following severe impairments: bipolar disorder, depression, substance addiction disorder, and personality disorder. (Tr. 22.) At step three, the ALJ determined that Sohaski's impairment or combination of impairments did not meet or medically equal a listing. (Tr. 22-24.) Before proceeding to step four, the ALJ determined that Sohaski's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the following RFC (Tr. 25):

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to unskilled work.

(Tr. 24).

Moving to step four, the ALJ found that Sohaski was unable to perform his past relevant work. (Tr. 30.) Based on the RFC and the vocational expert's testimony, the ALJ then determined at step five that Sohaski could perform a significant number of jobs within the economy. (Tr. 31.) Thus, Sohaski's claim for DIB was denied. (Tr. 31.)

### C. The ALJ's Decision Will Be Remanded Because the Court Cannot Trace His Logic Concerning His Consideration of Sohaski's Failure to Follow Treatment

Sohaski argues that the ALJ improperly denied him benefits under Social Security Ruling ("SSR") 82-59 when the ALJ found that he had been prescribed treatment that could restore his ability to work, but then did not follow that treatment. Sohaski's argument has merit, as the Court cannot adequately trace the ALJ's logic concerning his consideration of Sohaski's noncompliance with treatment.

The ALJ, after observing Sohaski's repeated incidences of noncompliance with treatment (Tr. 23, 25-26, 28), stated in his decision:

> Individuals with an impairment which is amenable to treatment that could be

12

> expected to restore their ability to work must follow the prescribed treatment to
> be found under a disability, unless there is a justifiable cause for the failure to
> follow such treatment. The claimant's treatment could restore his capacity to
> engage in substantial gainful activity. The evidence of record [sic] there has been
> refusal to follow prescribed treatment. The claimant's failure to follow prescribed
> treatment is not justifiable. (20 CFR 404.1530 and 416.930; SSR 82-59).

(Tr. 28.) On its face, this language suggests that the ALJ found Sohaski had a disabling impairment, but that the impairment was amenable to treatment that could restore his ability to work. If so, the ALJ was required to comply with the procedural requirements of SSR 82-59 before denying disability on that basis.

Under SSR 82-59, an ALJ may deny a claimant DIB based on a failure to follow prescribed treatment *only* where all of the following conditions exist:

> 1. The evidence establishes that the individual's impairment precludes
> engaging in any substantial gainful activity . . . ;
>
> 2. The impairment has lasted or is expected to last for 12 continuous
> months from onset of disability or is expected to result in death;
>
> 3. Treatment which is clearly expected to restore capacity to engage in
> any [substantial gainful activity] (or gainful activity, as appropriate) has
> been prescribed by a treating source; and
>
> 4. The evidence of record discloses that there has been refusal to follow
> prescribed treatment.

1982 WL 31384, at *1.

Where the Commissioner concludes that a claimant has failed to comply with treatment, SSR 82-59 further requires that the ALJ make a determination as to whether the failure to follow prescribed treatment is "justifiable." *Id*. Certain circumstances under which a claimant's failure to follow prescribed treatment will be generally accepted as "justifiable" (and, therefore, would not preclude a finding of disability), and include an inability "to afford prescribed treatment

which he or she is willing to accept, but for which free community resources are unavailable."

*Id*. at *4.

When assessing whether the claimant's noncompliance was "justifiable," SSR 82-59 requires that the ALJ develop the record concerning the claimant's noncompliance and the reasons therefore:

> The claimant or beneficiary should be given an opportunity to fully express the specific reason(s) for not following the prescribed treatment. . . . The individuals should be encouraged to express in their own words why the recommended treatment has not been followed. They should be made aware that the information supplied will be used in deciding the disability claim and that . . . continued failure to follow prescribed treatment without good reason can result in denial or termination of benefits.

*Id*. at *2.

Here, Sohaski emphasizes that the ALJ failed to develop the record about his noncompliance with treatment as required by SSR 82-59. That is, the ALJ never asked Sohaski at the hearing about his reasons for failing to follow prescribed treatment. Nor did the ALJ inform Sohaski that information supplied would be used in deciding the disability claim and that continued failure to follow treatment without good reason could result in a denial of benefits. Sohaski argues that the ALJ's omission is material because the record evidences that he cannot afford treatment—one of the reasons identified as "justifiable" in SSR 82-59. Thus, as Sohaski sees it, the ALJ committed a material procedural error when he found that Sohaski was not disabled on the basis that he failed to follow prescribed treatment. (Tr. 28.)

The Commissioner apparently recognizes the ALJ's misstep, as the Commissioner does not, in response, argue that the ALJ actually complied with the requirements of SSR 82-59. Instead, the Commissioner asserts that although the ALJ cited SSR 82-59, he actually used

Sohaski's failure to comply with treatment only "as part of a robust analysis of [Sohaski's] credibility," *not* as independent grounds to deny disability. (Resp. Br. 4.) Thus, according to the Commissioner, the requirements of SSR 82-59 are inapplicable to this case.

In support, the Commissioner points to several other courts who rejected a claimant's argument that the ALJ violated SSR 82-59 and then concluded that the ALJ used the claimant's noncompliance merely in the context of making a credibility determination. *See, e.g.*, *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001); *Roberts v. Shalala*, 66 F.3d 179, 183 (7th Cir. 1995); *Luckett v. Astrue*, No. 11-cv-3342, 2012 WL 3485287, at *11 (C.D. Ill. Aug. 15, 2012) (finding that SSR 82-59 did not apply because the ALJ found the claimant did not have a disabling condition regardless of his compliance or noncompliance with medication); *Conner v. Barnhart*, No. 1:04cv0469, 2005 WL 1939951, at *4 (S.D. Ind. June 28, 2005); *Kepple v. Apfel*, No. 99 C 4469, 2000 WL 1810090, at *13 (N.D. Ill. Dec. 8, 2000). The Commissioner is, in essence, suggesting that the ALJ committed a "harmless error" when he penned an entire paragraph about the requirements of SSR 82-59 and concluded that "[t]he claimant's treatment could restore his capacity to engage in substantial gainful activity." (Tr. 28); *see Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the determination).

The Commissioner's argument is somewhat appealing, as the ALJ analyzed Sohaski's credibility in several paragraphs immediately preceeding and following the paragraph in which he discussed SSR 82-59. (*See* Tr. 28-29.) In those paragraphs, the ALJ cited several reasons why Sohaski's complaints did not appear particularly credible, including observations by the medical providers that Sohaski was "manipulative and [] not always honest" (Tr. 28) and was

15

"engaging in possible malingering or misrepresentation" (Tr. 30); that the treatment he received was "essentially routine and/or conservative in nature consisting mainly of counseling and medications" and he had not been hospitalized since October 2008 (Tr. 28); and that no treating provider assigned him any restrictions, and there was "scant, infrequent and non[]descript medical evidence of record" (Tr. 29). Notably, Sohaski does not challenge the ALJ's credibility determination on appeal.

Indeed, Sohaski does not appear to be a particularly credible claimant. But that still does not sweep away the problem that the ALJ's logic is difficult to trace concerning his consideration of Sohaski's noncompliance with treatment. *See Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) ("An ALJ . . . must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning."). Significantly, the ALJ mentioned Sohaski's noncompliance with treatment or gaps in treatment *no less than ten times* in his decision.[6] (Tr. 23, 25-26, 28.) The ALJ then penned an entire paragraph on Sohaski's noncompliance, proclaiming that his "treatment could restore his capacity to engage in substantial gainful activity," that the evidence reflected that "there has been a refusal to follow prescribed treatment," and that Sohaski's "failure to follow prescribed treatment is not justifiable." (Tr. 28.) The ALJ cited SSR 82-59 at the close of this paragraph. (Tr. 28.)

In the face of such statements, the Court is not persuaded by the Commissioner's arguments and cannot definitively conclude that the requirements of SSR 82-59 are inapplicable

---

[6] Of course, as a general principle, "it is questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Seamon v. Barnhart*, No. 05-C-13-C, 2005 WL 1801406, at *19-20 (W.D. Wis. July 29, 2005). The Seventh Circuit Court of Appeals has recognized that "mental illness in general . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006).

to this case. In the cases cited by the Commissioner, there is no indication that the ALJ went so far as to pen an entire paragraph on SSR 82-59 and proclaim "[t]he claimant's treatment could restore his capacity to engage in substantial gainful activity" as he did in this case. (Tr. 28); *cf. Kinney v. Comm'r of Soc. Sec.*, 244 F. App'x 467, 470 (3rd Cir. 2007) (unpublished); *Brindisi*, 315 F.3d at 787; *Holley*, 253 F.3d at 1092; *Roberts*, 66 F.3d at 183; *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); *Luckett*, 2012 WL 3485287, at *11; *Conner*, 2005 WL 1939951, at *4; *Kepple*, 2000 WL 1810090, at *13. In short, the gaps here in the ALJ's logic are too significant to characterize them as mere "harmless error."

Therefore, the Commissioner's final decision will be remanded so that the ALJ can actually comply with the requirements of SSR 82-59, *see Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000) (observing that SSRs are "binding on all components of the Social Security Administration"), or make it clear he did not rely on Sohaski's noncompliance with prescribed treatment as the basis to deny disability.[7] *See, e.g.*, *Burnside v. Apfel*, 223 F.3d 840, 843-44 (8th Cir. 2000) (remanding where, among other problems, it was not clear from the record whether the ALJ relied upon the claimant's failure to stop smoking, as his doctor recommended, as a basis for the decision to deny benefits); *Campbell v. Astrue*, No. 1:09-CV-314, 2010 WL 2985935, at *11 (S.D. Ind. July 27, 2010); *Peevy v. Astrue*, No. 1:08-cv-111, 2009 WL 721680, at *6 n.5 (N.D. Ind. Mar. 18, 2009) (remanding the case where it was unclear whether the ALJ denied disability under SSR 82-59).

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and

---

[7] Because a remand is warranted on Sohaski's first argument, the Court need not reach his remaining argument—that the ALJ erred by failing to consider his GAF scores when assigning his RFC.

the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Sohaski and against the Commissioner.

SO ORDERED.

Enter for this 3rd day of October, 2013.

S/Roger B. Cosbey<br>
Roger B. Cosbey,<br>
United States Magistrate Judge